## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| PATRICK E. WALKER and LISA HENSHAW, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> IHEART COMMUNICATIONS, INC., THE BOARD OF DIRECTORS OF IHEART COMMUNICATIONS, INC., THE RETIREMENT BENEFITS COMMITTEE, and JOHN DOES 1-30. <br><br> Defendants. | **CLASS ACTION COMPLAINT** <br><br> **Case No.:** |

## COMPLAINT – CLASS ACTION

Plaintiffs, Patrick E. Walker and Lisa Henshaw ("Plaintiffs"), by and through their attorneys, on behalf of the iHeart Media, Inc. 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include iHeart Communications, Inc., ("iHeart" or "Company"), the Board of Directors of iHeart Communications, Inc., ("Board") and its members during the Class

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. For a period of time in 2014, the Plan was known as the Clear Channel Communications, Inc. 401(k) Saving Plan until its name was changed to the iHeart Media, Inc. 401(k) Plan in October of 2014. Both the Clear Channel Communications, Inc. 401(k) Saving Plan and the iHeart Media, Inc. 401(k) Plan will be referred to collectively herein as the "Plan."

Period[2], and the Retirement Benefits Committee and its members ("Committee") during the Class Period for breaches of their fiduciary duties.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

3.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

4.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

5.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of

---

[2] The Class Period is defined as August 19, 2014 through the date of Judgment.

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Even though 401(k) accounts are fully funded at all times, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

7.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See*, "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*., at 5.

9.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.    At all times during the Class Period (August 19, 2014 through the date of judgment) the Plan had at least $890 million dollars in assets under management. At the end of 2017 and 2018, the Plan had over $1.1 billion dollars and $1 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.    Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

12.    In many instances, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider certain collective trusts available during the Class Period as alternatives to the mutual funds in the Plan, despite their lower fees and materially similar investment objectives.

13.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

18.      Plaintiff, Patrick E. Walker ("Walker"), resides in Phoenix, Arizona.  During his employment, Plaintiff Walker participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff, Lisa Henshaw ("Henshaw"), resides in San Antonio, Texas.  During her employment, Plaintiff Henshaw participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

22.     Several months prior to filing this lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s), which potentially contain the specifics of Defendants' ***actual*** practice in making decisions with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments.  Plaintiffs' request for meeting minutes was denied.

23.     Accordingly, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a

claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

24.     Having never managed a jumbo 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

25.     IHeart is the Plan sponsor and a named fiduciary with a principal place of business being 3500 Maple Avenue, Suite 300, Dallas, Texas, which is also the address of the Board and the Committee.  2018 Form 5500 filed with the Dept. of Labor ("2018 Form 5500") at 1.

26.     As described in iHeart's 2020 10-K filing with the United States Securities and Exchange Commission ("2020 10-K") "iHeartMedia is the number one audio media company in the U.S. based on consumer reach." 2020 10-K at 1.  IHeart further describes its business as including "broadcast radio, digital, mobile, podcasts, social, live events including mobile platforms and products, program syndication, traffic, weather, news and sports data distribution and on-demand entertainment." 2020 10-K at 2.  In 2019, iHeart had revenues of over $3.4 billion.  As described in the 2020 10-K: "[o]ur Audio segment revenue was $3,454.5 million in 2019, $3,353.8 million in 2018 and $3,357.2 million in 2017." *Id.*  As of February 21, 2020, iHeart "had approximately 11,400 employees." 2020 10-K at 8.

27.     IHeart, acting through its Board of Directors, delegated its fiduciary duties for selecting and monitoring investments in the Plan to the Committee.  The iHeart Communications, Inc. Retirement Benefit Plans Statement of Investment Policy as revised effective September of 2014 ("IPS") at 2. The IPS provides that: "[t]he iHeart Board of Directors has oversight

responsibility of the Plans and may delegate any authority or responsibility to a committee." *Id.* As further detailed in the IPS: "[t]he Board of Directors of iHeart has authorized and empowered a committee of employees (the 'Retirement Benefits Committee' or the 'Committee') to oversee the management of the Plans." *Id.*

28.    IHeart also makes discretionary decisions as to the amount of company contributions to Plan participants. IHeart Media, Inc. 401(k) Savings Plan as Amended and Restated Effective October 1, 2014 ("Plan Doc."). In fact, the Plan Doc. was specifically amended in 2014 to "cap the employer matching contributions at $5,000 per plan year effective January 1, 2015…." Plan Doc. at viii.

29.    Lastly, as noted above, the Company acted through its officers, including the Board and Committee, and their members, to perform Plan-related fiduciary functions in the course and scope of their employment.

30.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

31.    As noted above, "[t]he Board of Directors of iHeart has authorized and empowered a committee of employees (the 'Retirement Benefits Committee' or the 'Committee') to oversee the management of the Plans." IPS at 2.

32.    Under the ERISA fiduciaries who have the power to appoint other fiduciaries have the concomitant duty to monitor their appointees.

33.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint

and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

34.    The unnamed members of the Board during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

35.    The Committee is responsible for "[i]dentifying investment options (i.e. types of funds) consistent with this program which it deems appropriate and prudent to make available to plan participants." IPS at 2. The Committee is also required to monitor "investment results by means of regular reviews and analyses to determine whether the investment managers and/or funds selected are meeting the guidelines and criteria identified …." *Id.*   The Committee is also responsible for insuring that all the funds in the Plan "[h]ave a reasonable expense ratio compared to other vehicles with an appropriate peer group …." IPS at 10.   As discussed below, the Committee has failed to carry out these fiduciary duties.

36.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

37.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

38.    To the extent that there are additional officers, employees and/are contractors of iHeart who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join

9

them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, iHeart officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    THE PLAN

39.    The Plan was originally known as the Clear Channel Communications, Inc. 401(k) Savings Plan and was established on January 1, 1987.  Plan Doc. at v.  The Plan underwent several amendments until it was finally amended on October 1, 2014 to change the name to its current name: iHeart Media, Inc. 401(k) Savings Plan.  Plan Doc. at viii.  As detailed in the SPD, the Plan was established "to help you prepare for a comfortable retirement." SPD at 1.

40.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

*Eligibility*

*41.*    In general, regular full-time employees who are at least 21 years of age and "have been employed with iHeart for ninety (90) calendar days" are eligible to participate in the Plan. SPD at 2.

*Contributions*

42.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover

contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and

employee after-tax contributions.  SPD at 5-8.

43.    With regard to employee contributions, "[e]ach year, participants may elect to

contribute up to 25% of their eligible pay on a pre-tax basis, up to the annual IRS maximum 401(k)

deferral limit of $18,500 in 2018." December 31, 2018 Auditor Report of the iHeart Media, Inc.

401(k) Plan ("2018 Auditor Report") at 4.

44.    With regard to matching contributions made by iHeart, iHeart will contribute "an

amount equal to 50% of the first 5% of each participant's voluntary contributions under the Plan."

*Id.*  Additionally, iHeart had the ability to make employer elective contributions but made none in

2018.  *Id.*

45.    Like other companies that sponsor 401(k) plans for their employees, iHeart enjoys

both direct and indirect benefits by providing matching contributions to Plan participants.

Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at

the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-

plans/plan-sponsor/401k-plan-overview.

46.    iHeart also benefits in other ways from the Plan's matching program.  It is well-

known that "[o]ffering retirement plans can help in employers' efforts to attract new employees

and reduce turnover."  *See* https://www.paychex.com/articles/employee-benefits/employer-

matching-401k-benefits.

47.    Given the size of the Plan, iHeart likely enjoyed a significant tax and cost savings

from offering a match.

### *Vesting*

48.    Participants are immediately vested in their contributions.  2018 Auditor Report at

5.  Vesting in iHeart's contributions to the Plan are based on years of continuous service. *Id.*  "A

participant is 100% vested in the Plan Sponsor's contributions to the participant's account after five years of credited service …." *Id.*

### The Plan's Investments

49.     The Committee is also purportedly required to monitor "investment results by means of regular reviews and analyses to determine whether the investment managers and/or funds selected are meeting the guidelines and criteria identified …." IPS at 2. But in practice, as alleged below, the Committee breached its fiduciary duties.

50.     Several funds were available to Plan participants for investment each year during the putative Class Period, including a suite of target date funds managed by Fidelity, the Plan's recordkeeper.

51.     The Plan's assets under management for all funds as of December 31, 2018 was over $1 billion dollars.  2018 Auditor Report at 3.

### Payment of Plan Expenses

52.     During the Class Period Plan assets were used to pay for expenses incurred by the Plan, including recordkeeping fees. Plan Doc. at 48.  As detailed in the Plan Doc: "All expenses that arise in connection with the administration of the Plan … shall be paid from the assets of the Trust Fund held by the funding agent under the Trust Agreement." *Id.*

### V.     CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

any time between August 19, 2014 through the date of judgment (the "Class Period").

54.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 10,331 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

55.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

56.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

57.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

58.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

59.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

60.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

61.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary

functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

62.    As described in the Parties section above, Defendants were fiduciaries of the Plan because:

(a)    they were so named; and/or

(b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)    they had discretionary authority or discretionary responsibility in the administration of the Plan.

63.    As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law."  *Main,* 248 F.Supp.3d at 792 (N.D. Tex. 2017).

64.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

65.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

66.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

67.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an

act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

68.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

69.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

70.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.    SPECIFIC ALLEGATIONS

**A.    Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

71.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several investments in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

72.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts, ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

73.    Investment options have a fee for investment management and other services.  With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For  example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

74.     When jumbo plans, particularly those with over a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

75.     One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their higher costs relative to the same or similar investments available.  This fiduciary failure decreased participant compounding returns and reduced the available amount participants will have at retirement.

76.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period – which stayed relatively unchanged during the Class Period - were more expensive than comparable funds found in similarly sized plans (plans having over a billion dollars in assets).

77.     In 2018, for example, the expense ratios for a majority of the mutual funds in the Plan, at least 14 out of the Plan's 22 mutual funds (62%) were more expensive than the ICI median for the same category of fund. In some cases, the funds differed by as much as *103%* (in the case of the Voya Small Cap Opportunity I) and *97%* (in the case of the Goldman Sachs Small Cap Value Inst fund). The chart below illustrates these differences for each applicable fund in the Plan:[5]

---

[5] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

| Plan Fund | Expense Ratio[6] | Category | ICI Median Fee |
|---|---|---|---|
| Fidelity Freedom K 2020 Fund | 0.53% | Target Date | 0.47% |
| Fidelity Freedom K 2025 Fund | 0.56% | Target Date | 0.47% |
| Fidelity Freedom K 2030 Fund | 0.60% | Target Date | 0.47% |
| Fidelity Freedom K 2035 Fund | 0.63% | Target Date | 0.47% |
| Fidelity Freedom K 2040 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2045 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2050 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2055 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Growth Company Class K | 0.76% | Domestic Equity | 0.33% |
| Goldman Sachs Small Cap Value Inst | 0.95% | Domestic Equity | 0.33% |
| Trowe Price Institutional Large Cap Value | 0.57% | Domestic Equity | 0.33% |
| Voya Small Cap Opportunity I | 1.03% | Domestic Equity | 0.33% |
| Eaton Vance Atl Cap SMID R6 | 0.82% | Domestic Equity | 0.33% |
| Fidelity Diversified International Class K | 0.69% | Int'l Equity | 0.50% |

78.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period. That is because the above ICI Median fee is based on a study conducted in 2016 when expense ratios were generally higher than fees today or even in 2019 given the downward trend of expense ratios the last few years. Indeed, the ICI median expense ratio for target date funds for plans with over 1 billion dollars in assets was 0.56% using 2015 data compared with 0.47% in 2016. Accordingly, 2019 median expense ratios would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

79.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

---

[6]  The listed expense figures are as of 2019.

*Failure to Investigate Availability of Lower Cost Collective Trusts*

80.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

81.    Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

82.    As noted *supra*, ERISA is derived from trust law.  *Tibble I*, 135 S. Ct. at 1828.  Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law.  *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."  Restatement (Third) of Trusts, § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

83.    Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k)

21

plan specific shares of mutual funds. Defendants knew this, or at least should have known this, given the prevalence of collective trusts in the market-place during the Class Period.

84.    Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[7]

85.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses. As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

---

[7] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, Employee Benefit News (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter "*CITs Gaining Ground*"). Many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual funds. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

86.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.  Here, during the Class Period, Fidelity offered collective trust versions of the target date funds in the Plan with the exception of the FIAM Blend Target Date 2060 Q Fund which was not available until May 15, 2015:

| Fund in Plan | Exp. Ratio[8] | Collective Trust Version | Incep Date | Exp. Ratio[9] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Diversified International Class K | 0.69% | Fidelity Diversified International Commingled Pool | Dec. 13 2013 | 0.58% | 17% |
| Fidelity Growth Company Class K | 0.76% | Fidelity Growth Company Commingled Pool | Dec. 13 2013 | 0.43% | 55% |
| Fidelity Freedom K 2010 Fund | 0.46% | FIAM Blend Target Date 2010 Q Fund | Oct. 31 2007 | 0.32% | 35% |
| Fidelity Freedom K 2020 Fund | 0.53% | FIAM Blend Target Date 2020 Q Fund | Oct. 31 2007 | 0.32% | 49% |
| Fidelity Freedom K 2030 Fund | 0.60% | FIAM Blend Target Date 2030 Q Fund | Oct. 31 2007 | 0.32% | 61% |
| Fidelity Freedom K 2040 Fund | 0.65% | FIAM Blend Target Date 2040 Q Fund | Oct. 31 2007 | 0.32% | 68% |
| Fidelity Freedom K 2050 Fund | 0.65% | FIAM Blend Target Date 2050 Q Fund | Oct. 31 2007 | 0.32% | 68% |
| Fidelity Freedom K 2060 Fund | 0.65% | FIAM Blend Target Date 2060 Q Fund | May 15 2015 | 0.32% | 68% |

[8] The listed expense figures are as of 2019.

[9] The listed expense figures are as of 2019.

87.    The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

88.    As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, 960 F.3d 478, at 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda,* 923 F.3d at 329 (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).  Here, "[t]he eligibility requirement for FIAM Blend Target Date is $25 million in client assets."  *See* Fidelity Pricing Options for Retirement Plans as of Dec. 31, 2019 ("Fidelity Pricing"), p. 11.  And, "[c]lient assets is defined as assets invested in qualified defined contribution plans only, which are profit sharing, 401(k), and defined benefit plans that are qualified under Section 401(a) and governmental plans that are described in section 401(a)24 of the IRS code."  *Id.*

89.    Clearly, per the below chart, the Plan had sufficient assets under management during the Class Period to qualify for Fidelity collective trusts:

| Fund in the Plan | 2018 AUM | 2017 AUM | 2016 AUM | 2015 AUM | 2014 AUM |
|---|---|---|---|---|---|
| Fidelity Diversified International Class K | $61,659,381 | $74,727,063 | $57,458,725 | $63,040,486 | $62,190,357 |
| Fidelity Growth Company Class K | $101,569,265 | $111,114,026 | $81,751,134 | $84,656,008 | $77,127,269 |
| Fidelity Freedom K 2010 Fund | $38,670,098 | $43,644,574 | $43,621,611 | $44,508,044 | $48,318,259 |
| Fidelity Freedom K 2020 Fund | $47,510,639 | $58,029,733 | $50,017,928 | $47,859,399 | $46,289,493 |
| Fidelity Freedom K 2030 Fund | $74,259,769 | $80,510,546 | $66,472,631 | $59,404,078 | $55,477,878 |

| Fidelity Freedom K 2040 Fund | $58,031,371 | $63,643,299 | $50,633,014 | $43,680,030 | $38,853,232 |
| Fidelity Freedom K 2050 Fund | $39,670,880 | $41,597,122 | $30,390,138 | $22,367,530 | $17,296,169 |

90.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper available collective trusts and transferred the Plan's investments into the lower cost funds at the earliest opportunity.

91.     There is no good-faith explanation for utilizing higher-cost funds when lower-cost funds are available for the exact same investment.  Indeed, given that the collective trusts were comprised of the same underlying investments as their mutual fund counterparts, and managed by the same investment manager, but had lower fees, they generally had greater returns when looking at the 1, 3, 5, and 10 year average annual returns.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive funds; the only consequence was higher costs for Plan participants.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

92.     Moreover, it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 8 (C.D. Cal. Aug. 16, 2017) ("*Tibble III*").  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing."  *Id.*, at * 11.  This lack of basic fiduciary practice resonates loudly in this case given the unreasonable recordkeeping and administrative costs arrangements put in place by Defendants.

93.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

94.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

95.     iHeart's retirement plan is large and has scale which affords the Plan fiduciaries the opportunity to negotiate for lower recordkeeping costs and get access to the same investments with lower expense ratios which benefit the plan participants because the returns are higher and compounding greater.   Beginning in 2014 the Plan contracted for per participant annual recordkeeping fees of $64 and beginning in 2018 this rate was $52 per participant.

96.     Even though the Plan already had this "per capita" charge, the Plan fiduciaries chose to augment it further by allowing the investment providers to share in the cost of Plan administration via "revenue sharing," where the revenue that is shared is included as part of each mutual fund's/investment's expense ratio.   The following structure was implemented.   If the

revenue sharing amount of the investment(s)/mutual fund(s) exceeds the total administration cost(s), a "credit" is applied to the investment option(s) and may be rebated back to the participant(s) at the Plan fiduciary's discretion with regards to when and how much.  If the revenue sharing amount is less than the total administration costs then that credit becomes a fee and is applied.

97.     It is important to note that to the investment provider, a portion of the expense ratio is considered revenue, and possibly to the record-keeper as well, but is a detriment to the participant's return because it reduces it and the compounding effect.

98.     Beginning on January 1, 2012, the Plan participated in Fidelity's participant revenue credit program through which recordkeeping fees and other Plan administrative costs were paid through the following structure.  The Trustee made annual revenue credit payments, from the funds it received through revenue sharing, to a Revenue Credit Account.    Afterward, the administrator could direct the Trustee to use amounts held in the Revenue Credit Account to reimburse the Sponsor for fees and expenses associated with services provided to the Plan, or pay such vendors, including the Trustee or third parties, directly.  Any unused amounts is not required to be remitted back to participants.

99.     First, the $52 to $62 range of per participant recordkeeping charges is already unreasonably high even before creating an unnecessary interdependence between participant investment returns and the revenue that investment providers receive via revenue crediting.  Given the size of the Plan, the Plan's fiduciaries could have negotiated for annual per participant recordkeeping fees below $35.[10]  Accordingly, the Plan was paying a significant percentage more

---

[10] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016)

than it should have been for recordkeeping services (between 33% and 44%) without factoring in the additional revenue sharing/crediting cost burden.

100.    Second, over the years, the arrangement of placing revenue sharing funds into a Revenue Account before disbursement to pay for Plan expenses deprived Plan participants of use of their money and millions of dollars in lost opportunity costs.  This arrangement was completely unnecessary given that the Plan's fiduciaries had already agreed to a per participant/capita fee.

101.    A more prudent arrangement in this case, also more transparent and easier to comprehend by participants, would have been to take advantage of the Plan's scale by selecting available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

102.    By failing to investigate the availability of certain collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.  Defendants further cost Plan participants millions of dollars during the Class Period by (1) failing to negotiate a lower recordkeeping rate with Fidelity and (2) to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants.

***Failure to Utilize Lower Fee Share Classes***

103.    Plan fiduciaries had an option to choose lower cost Fidelity collective trusts during the Class Period.  But they also had the option of other lower cost identical funds which they

---

(declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

similarly failed to select.  Since June 2017, Fidelity has offered K shares of its target date funds.

Generally, "K6 Funds and Class K are available to retirement plans recordkept at Fidelity [like the

Plan here]." Fidelity Pricing at 3.  "K6 Funds are intended for plan sponsors that do not want to

receive any revenue sharing or recordkeeping offsets." *Id.*  The K6 target date shares were

significantly cheaper than the Class K shares – price being the only difference between the two

classes of shares.  The following chart illustrates the point:

| Fund in Plan | Exp. Ratio[11] | K6 | Incep Date[12] | Exp. Ratio[13] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2005 Fund | 0.42% | Fidelity Freedom K6 2005 Fund | June 7 2017 | 0.37% | 14% |
| Fidelity Freedom K 2010 Fund | 0.46% | Fidelity Freedom K6 2010 Fund | June 7 2017 | 0.39% | 18% |
| Fidelity Freedom K 2015 Fund | 0.49% | Fidelity Freedom K6 2015 Fund | June 7 2017 | 0.41% | 20% |
| Fidelity Freedom K 2020 Fund | 0.53% | Fidelity Freedom K6 2020 Fund | June 7 2017 | 0.43% | 23% |
| Fidelity Freedom K 2025 Fund | 0.56% | Fidelity Freedom K6 2025 Fund | June 7 2017 | 0.45% | 24% |
| Fidelity Freedom K 2030 Fund | 0.60% | Fidelity Freedom K6 2030 Fund | June 7 2017 | 0.47% | 28% |
| Fidelity Freedom K 2035 Fund | 0.63% | Fidelity Freedom K6 2035 Fund | June 7 2017 | 0.49% | 29% |
| Fidelity Freedom K 2040 Fund | 0.65% | Fidelity Freedom K6 2040 Fund | June 7 2017 | 0.50% | 30% |
| Fidelity Freedom K 2045 Fund | 0.65% | Fidelity Freedom K6 2045 Fund | June 7 2017 | 0.50% | 30% |

[11] The listed expense figures are as of 2019.

[12] *See* May 30, 2020 Fidelity Freedom Funds Prospectus.

[13] The listed expense figures are as of 2019.

| Fund in Plan | Exp. Ratio[11] | K6 | Incep Date[12] | Exp. Ratio[13] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2050 Fund | 0.65% | Fidelity Freedom K6 2050 Fund | June 7 2017 | 0.50% | 30% |
| Fidelity Freedom K 2055 Fund | 0.65% | Fidelity Freedom K6 2055 Fund | June 7 2017 | 0.50% | 30% |
| Fidelity Freedom K 2060 Fund | 0.65% | Fidelity Freedom K6 2060 Fund | June 7 2017 | 0.50% | 30% |
| Fidelity Freedom Income K | 0.42% | Fidelity Freedom Income K6 | June 7 2017 | 0.37% | 12% |
| Fidelity Diversified Intl Fund Class K | 0.69% | Fidelity Diversified Intl Fund Class K6 | May 5 2017 | 0.60% | 14% |

104.    Additionally, the Plan fiduciaries added one fund during the Class Period that cost more than available identical lower share classes:

| Fund in Plan | Years in the Plan | 2018 AUM | Exp. Ratio | Lower Cost Share | Exp. Ratio [14] | % Fee Excess |
|---|---|---|---|---|---|---|
| Voya Small Cap Opportunity I | Entire Class Period | $16,957,527 | 1.03% | Voya Small Cap Opportunity R6 | 0.95% | 8% |

105.    Recently, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble III*, 2017 WL 3523737, at * 13.

---

[14] The listed expense figures are as of 2019.

106.    Defendants knew or should have known of the existence of the above cheaper share classes (for the Fidelity funds and the Voya fund) and therefore also should have immediately identified the prudence of selecting the alternative investments which were all available during the Class Period.

107.    As noted above, qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds. However, initial investment minimums are generally waived for financial intermediaries and retirement plans.

108.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and selected a lower share class than the one in the Plan.

109.    Failure to do so was either because Defendants did not negotiate aggressively enough with their service providers to obtain better pricing or they simply were not paying attention.

110.    Nor is it an excuse to select higher cost versions of the same fund to pay for Plan expenses.  As noted above, fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Tibble III*, 2017 WL 3523737, at * 11.

111.    By failing to investigate the use of lower cost share classes, Defendants caused the Plan and its participants to pay millions of dollars per year in unnecessary fees.

### ***Failure to Utilize Lower Cost Passively-Managed Funds***

112.    As noted *supra*, ERISA is derived from trust law.  *Tibble I*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts, § 100 cmt. b(1).

113.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available   at   https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively-managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*, available   at   [http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html](http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html) ("long-term data suggests that actively-managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

114.    Indeed, on average, funds with high fees perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

115.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

116.    The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed alternative funds in the same fund category.  The chart below analyzes funds in the Plan in 2018 using 2018 expense

ratios as a methodology to demonstrate the greater relative expense of the Plan's funds compared to their alternative fund counterparts.

| Fund in Plan | Net Expense Ratio | Passive Alternatives | Net Expense Ratio[15] | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2005 Fund | 0.42% | Fidelity Freedom Index 2005 Investor Class | 0.14% | Dec. 2 2009 | 200% |
| | | Fidelity Freedom Index 2005 Inst. Premium Class | 0.08% | June 24 2015 | 425% |
| Fidelity Freedom K 2010 Fund | 0.46% | Fidelity Freedom Index 2010 Investor Class | 0.14% | Oct. 2 2009 | 229% |
| | | Fidelity Freedom Index 2010 Inst. Premium Class | 0.08% | June 24 2015 | 475% |
| Fidelity Freedom K 2015 Fund | 0.49% | Fidelity Freedom Index 2015 Investor Class | 0.14% | Oct. 2 2009 | 250% |
| | | Fidelity Freedom Index 2015 Inst. Premium Class | 0.08% | June 24 2015 | 513% |
| Fidelity Freedom K 2020 Fund | 0.53% | Fidelity Freedom Index 2020 Investor Class | 0.14% | Oct. 2 2009 | 279% |
| | | Fidelity Freedom Index 2020 Inst. Premium Class | 0.08% | June 24 2015 | 563% |
| Fidelity Freedom K 2025 Fund | 0.56% | Fidelity Freedom Index 2025 Investor Class | 0.14% | Oct. 2 2009 | 300% |
| | | Fidelity Freedom Index 2025 Inst. Premium Class | 0.08% | June 24 2015 | 600% |

---

[15] As of June 1, 2019, Fidelity Freedom Index Funds – Investor Class' expenses were reduced to 0.12% from 0.14%.

| Fund in Plan | Net Expense Ratio | Passive Alternatives | Net Expense Ratio[15] | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2030 Fund | 0.60% | Fidelity Freedom Index 2030 Investor Class | 0.14% | Oct. 2 2009 | 329% |
| | | Fidelity Freedom Index 2030 Inst. Premium Class | 0.08% | June 24 2015 | 650% |
| Fidelity Freedom K 2035 Fund | 0.63% | Fidelity Freedom Index 2035 Investor Class | 0.14% | Oct. 2 2009 | 350% |
| | | Fidelity Freedom Index 2035 Inst. Premium Class | 0.08% | June 24 2015 | 688% |
| Fidelity Freedom K 2040 Fund | 0.65% | Fidelity Freedom Index 2040 Investor Class | 0.14% | Oct. 2 2009 | 364% |
| | | Fidelity Freedom Index 2040 Inst. Premium Class | 0.08% | June 24 2015 | 713% |
| Fidelity Freedom K 2045 Fund | 0.65% | Fidelity Freedom Index 2045 Investor Class | 0.14% | Oct. 2 2009 | 364% |
| | | Fidelity Freedom Index 2045 Inst. Premium Class | 0.08% | June 24 2015 | 713% |
| Fidelity Freedom K 2050 Fund | 0.65% | Fidelity Freedom Index 2050 Investor Class | 0.14% | Oct. 2 2009 | 364% |
| | | Fidelity Freedom Index 2050 Inst. Premium Class | 0.08% | June 24 2015 | 713% |
| Fidelity Freedom K 2055 Fund | 0.65% | Fidelity Freedom Index 2055 Investor Class | 0.14% | June 1 2011 | 364% |
| | | Fidelity Freedom Index 2055 Inst. Premium Class | 0.08% | June 24 2015 | 713% |

| Fund in Plan | Net Expense Ratio | Passive Alternatives | Net Expense Ratio[15] | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2060 Fund | 0.65% | Fidelity Freedom Index 2060 Investor Class | 0.14% | Jan. 12 2014 | 364% |
| | | Fidelity Freedom Index 2060 Inst. Premium Class | 0.08% | June 24 2015 | 713% |
| Fidelity Freedom Income K | 0.42% | Fidelity Freedom Index Income Fund Investor Class | 0.12% | Oct. 2 2009 | 111% |
| | | Fidelity Freedom Index Fund Inst. Premium Class | 0.08% | June 14 2015 | 136% |
| Voya Small Cap Opportunity I | 1.03% | Vanguard Russell 2000 Growth Index Inst | 0.08% | May 25 2011 | 1,187% |
| | | Vanguard Small Cap Growth Adm | 0.07% | Sept. 27 2011 | 1,371% |
| Goldman Sachs Small Cap Value Inst | 0.95% | Vanguard Small Cap Index Adm | 0.05% | Nov. 3 2011 | 1,800% |

117.    The above alternative funds generally outperformed the Plan's funds in their 3 and 5 year average returns as of 2020 given that they were comprised of virtually identical underlying funds but had lower fees.  Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

118.    These results are not surprising given that in the long-term, actively managed funds do not outperform their passively managed counterparts.  Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[16]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

119.    A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

120.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

---

[16] Source: https://us.spindices.com/spiva/#/reports

**B.    Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

121.    The structure of this Plan is rife with potential conflicts of interest because Fidelity and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.  Here, the Plan's Trustee is Fidelity, and an affiliate of Fidelity performs the recordkeeping services for the Plan.

122.    This conflict of interest is laid bare in this case where lower-cost Fidelity collective trusts and index funds – materially similar or identical to the Plan's other Fidelity funds (other than in price) – were available but not selected because the higher-cost funds returned more value to Fidelity.

123.    There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in Fidelity's coffers.

124.    The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Fidelity and its affiliates and ensure that the fees charged by Fidelity and its affiliates were reasonable and in the best interests of the Plan and its participants.  Clearly, Defendants failed this aspect of their fiduciary duties.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee Defendants)**

125.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

126.    At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA Section  3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

127.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA Section 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

128.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to investigate certain collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

129.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

130.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable

relief and other appropriate relief for the Prudence Defendants' breaches as set forth in their Prayer for Relief.

131.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Prudence Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against iHeart and the Board Defendants)**

132.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

133.     iHeart and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

134.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

135.     The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their

decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

136.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, imprudent choices of funds' class of shares, and inefficient fund management styles that adversely affected the investment performance of the Funds' and their participants' assets as a result of the Committee Defendants' imprudent actions and omissions;

(b)    Failing to monitor the processes by which Plan investments were evaluated, failing to correct the Committee Defendants' failure and continued failure to investigate the availability of lower-cost share classes and failing to correct the Committee Defendants' failure and continued failure to investigate the availability of lower-cost collective trust vehicles; and

(c)    Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

137.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.  Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.  An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.  An award of pre-judgment interest;

J.  An award of costs pursuant to 29 U.S.C. § 1132(g);

K.  An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.  Such other and further relief as the Court deems equitable and just.

Dated:    August 19, 2020              **MUNSCH HARDT KOPF & HARR, P.C.**

                                       /s/ Craig A. Harris_____.
                                       Craig A. Harris
                                       State Bar No. 09056750
                                       Natalie A. Sears
                                       State Bar No. 24098400
                                       500 N. Akard St., Suite 3800
                                       Dallas, Texas 75201
                                       (214) 855-7500 (telephone)
                                       (214) 855-7584 (facsimile)
                                       charris@munsch.com
                                       nsears@munsch.com

                                       **CAPOZZI ADLER, P.C.**

                                       /s/ Donald R. Reavey_____.
                                       Donald R. Reavey, Esquire
                                       (*Admission Pro Hac Vice to be Requested*)

PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh_____.
Mark K. Gyandoh, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class